## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ANTOINETTE F. SWANBERG, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 2:15-544 |
| | ) | |
| THE PNC FINANCIAL SERVICES GROUP, | ) | |
| INC., AND AFFILIATES LONG TERM | ) | |
| DISABILITY PLAN, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**Conti, Chief District Judge**

### I.  Introduction

Pending before the Court are cross-motions for summary judgment filed by plaintiff Antoinette F. Swanberg ("Swanberg" or "plaintiff") and defendant The PNC Financial Services Group, Inc. And Affiliates Long Term Disability Plan (the "Plan" or "defendant").  (ECF Nos. 22, 25.)  In her complaint, Swanberg seeks to recover long-term disability ("LTD") benefits from the Plan pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a)(1)(B) ("ERISA").  For the reasons that follow, Swanberg's motion for summary judgment will be denied, and defendant's motion for summary judgment will be granted.

### II.  Factual Background

On June 1, 1996, Swanberg was hired by PNC as an Asset Manager I on the Asset Resolution Team. (Combined Statement of Material Facts in Support of Defendant's Motion

("D.C.S.F.") (ECF No. 35) ¶ 6.)  In this capacity, Swanberg was primarily responsible for the development, implementation and management of a portfolio of credits.  (Id.)  The position of Asset Manager I is a sedentary position with no physical demands.  (Id.)

While employed by PNC, Swanberg participated in the Plan, an ERISA-governed employee welfare benefit plan.  (Id. ¶ 2.)  The Plan provides full-time, salaried employees who are out of work for longer than ninety-one days with LTD benefits of up to 60% of their base salary.  (Id.)  The Plan also allows participants to elect to purchase an additional 10% of LTD coverage at their own cost.  (Id.)  Swanberg participated in the Plan at the 70% benefit level.  (Id.)

In order to qualify for LTD benefits, a participant must establish that she is "unable to perform the material or essential duties of [her] own occupation as it is normally performed in the national economy."  (Id. ¶ 5.)  Prior to seeking LTD benefits, the participant must remain "totally disabled due to an injury or illness" for 91 consecutive days (without interruption by a return to work of more than 30 days).  (Id. ¶ 7; Administrative Record ("AR") 358.)  Once this 91 day "elimination period" ends, the participant may apply for LTD benefits.  (AR 360.)  The participant bears the responsibility of submitting proof that she is disabled and receiving appropriate treatment under the continued, regular care of a physician.  (D.C.S.F. ¶ 5.)  The Plan cautions that LTD benefits will be terminated if the participant fails to file a timely claim, refuses to undergo a requested medical examination or participate in a rehabilitation program, fails to submit proof of "disability or continuing disability upon request," or otherwise fails to cooperate in the administration of the claim or comply with an ongoing treatment plan.  (Id.)

The Plan is administered by Liberty Life Assurance Company ("Liberty") by virtue of an Administrate Services Only Agreement ("ASOA").  (Id. ¶ 4.)  That agreement vests Liberty with

sole discretionary authority to construe and interpret the terms of the Plan and to evaluate and determine eligibility for LTD benefits under the Plan. (Id.)

On September 18, 2013, Swanberg stopped working due to alleged symptoms of fatigue, lethargy, cognitive issues, neck and back pain, and leg cramps and spasms. (Id. ¶ 6.) Swanberg attributed these symptoms to her prior diagnosis of Multiple Sclerosis ("MS"). (Id.) After accounting for the Plan's elimination period, Swanberg's LTD effective date was December 19, 2013. (Id. ¶ 7.)

On December 18, 2013, Liberty case manager Richard Tom ("Tom") telephoned Swanberg to advise her that her LTD benefits were "being approved." (AR 12.) Tom also sent a letter on that same date confirming that Liberty had determined that Swanberg was eligible to receive LTD benefits based on the medical and vocational information in her file. (AR 35.) The approval letter cautioned that Swanberg's claim would be "evaluated periodically to determine ongoing eligibility" and noted that "approval at this time does not guarantee payments through the maximum benefit duration." (Id.) Tom requested that Swanberg complete a formal application for LTD benefits and return it to Liberty by January 18, 2014. (Id.)

On January 7, 2014, Swanberg submitted her LTD application papers. (AR 61.) In support of her claim, Swanberg supplied a written report provided by her attending physician, Dr. Weisman, a copy of her prior medical records, and a letter indicating that her request for Social Security disability benefits had been denied by the Social Security Administration. (AR 61, 72-76, 82-121.)

In his report, Dr. Weisman listed Swanberg's primary diagnosis as MS and noted that she also suffered from a sleep disorder. (AR 82.) Dr. Weisman characterized her diagnosis as "guarded" due to the cognitive changes effectuated by her MS and sleep disorder. (AR 83.) Dr.

Weisman's treatment notes consistently indicated that her MS was being effectively controlled by medication and that she was not displaying any symptoms suggestive of an MS relapse. (AR 84, 86, 88, 93.) He, however, expressed concern that her cognitive issues might be partially attributable to sleep apnea and ordered a sleep study. (AR 85-87, 93.)

After receiving her medical records, Liberty contacted Swanberg to request information about any upcoming medical visits. (D.C.S.F. ¶ 12.) Swanberg reported that she had scheduled upcoming visits with a neuropsychologist, Dr. Fields, and a psychiatrist, Dr. Buzogany. (Id.) On March 19, 2014, Liberty contacted Dr. Weisman, Dr. Fields, Dr. Buzogany, and Swanberg's primary care physician, Dr. McQuigg, to request updated medical records and treatment plans. (Id. ¶ 13.) Liberty also asked each physician to fill out a Restrictions Form or a Functional Mental Status Evaluation. (Id.)

In response to Liberty's request, Dr. Fields provided the results from a neuropsychological re-evaluation performed on February 20, 2014. (AR 152-160.) Dr. Fields stated that the purpose of his examination was to determine whether treatment for sleep apnea was having a positive effect on Swanberg's cognitive functioning. (AR 154.) During Swanberg's re-evaluation, Dr. Fields subjected her to a "21 Item Recognition Memory Test" in order to evaluate her responses and gauge her "tendency to exaggerate dysfunction." (AR 152.) Swanberg scored 11/21 on the test, a result that Dr. Fields characterized as "suggestive of less than optimal effort on at least some of the tests administered today." (Id.) Dr. Fields explained that, "[b]ecause a score of 50% can be obtained by chance, scores below 50% are thought to reflect an attempt to 'fake bad.'" (Id.) He concluded that "Mrs. Swanberg's performance . . . (i.e., 52% correct on a test on which 50% correct can be obtained by chance) was: 1) significantly weaker than her performance [during a prior evaluation] and 2) suggestive of less

than optimal effort on at least some of the tests in the battery." (AR 154.) Swanberg's responses to several other test categories, such as attention, language, speed of processing, and memory, ranged from "average" to "impaired." (AR 153-154.) Dr. Fields did not indicate any restrictions or limitations on the Restrictions Form provided by Liberty. (AR 162.)

Dr. Weisman responded to Liberty's request for additional information on March 26, 2014. (AR 164-168.) Dr. Weisman noted that Swanberg suffered from "severe fatigue, poor overall endurance, inability to concentrate and process info properly" and that she could not stand or walk for long. (AR 165.) Dr. Weisman did not indicate any specific restrictions or limitations, but opined that Swanberg was "permanently disabled in [his] opinion" based on the results of Dr. Fields' re-evaluation. (Id.)

Dr. McQuigg responded to Liberty's request on March 27, 2014. (AR 169-180.) His records reflect that Swanberg presented at his office for a six-month examination on February 5, 2014. (AR 171-175.) During that visit, Dr. McQuigg noted that Swanberg's MS was asymptomatic and that she was "doing well" with her MS management. (AR 171.) His notes also reflect that her mood was "off" but that her "chief complaint" was "cold symptoms." (Id.) She also complained of fatigue and difficulty with concentration. (Id.) Dr. McQuigg did not indicate any restrictions or limitations for Swanberg on the Restrictions Form supplied by Liberty. (AR 170.)

Dr. Buzogany responded to Liberty's request by providing records from Swanberg's visits to his office on February 21, 2014, and March 25, 2014, for a psychiatric consultation. (D.C.S.C. ¶ 17-18; AR 198-223.) During the February visit, Swanberg reported experiencing "insomnia, anhedonia, lacking motivation energy and concentration." (AR 204.) Dr. Buzogany also noted that she suffered from mood swings and irritability, was easily distracted, prone to

gross impulsivity, and occasionally paranoid. (Id.) He characterized her orientation, memory, attention, and language as "normal," her judgment and insight as "intact," and her thought-processes and thought-associations as "normal" and without deficiency. (AR 207.) Swanberg rated her own mood as five out of ten on a scale of one (poor) to ten (good). (AR 204.) Dr. Buzogany recommended treatment with Lamotrigine, a mood stabilizing drug, and individual psychotherapeutic counseling. (AR 209.)

During Swanberg's March 2014 visit, Dr. Buzogany noted that she continued to report symptoms of mood swings and irritability, but her anxiety had decreased and her medication appeared to be well-tolerated and effective. (AR 198.) He again characterized her orientation, memory, attention, and language as "normal," her judgment and insight as "intact," and her thought-processes and thought-associations as "normal" and without deficiency. (AR 201.) Dr. Buzogany did not complete the Functional Mental Status Evaluation form requested by Liberty. (AR 217-219.)

After receiving the medical records described above, Liberty referred Swanberg's file for review by an independent neuropsychologist, Dr. Crouch, and an independent neurologist, Dr. Klein. (D.C.S.F. ¶¶ 19-21.) Dr. Crouch's report, dated May 21, 2014, included a detailed review of Swanberg's LTD file and a summary of her treatment records and progress notes from Drs. Buzogany, McQuigg, Weisman and Fields. (AR 231-235.) Dr. Crouch concluded that the available medical documentation failed to provide valid or reliable evidence of "neurocognitive impairment secondary to Cognitive Disorder." (AR 228.) Dr. Crouch characterized the neuropsychological evaluation performed by Dr. Fields as "significantly flawed" due to numerous factors, including: the limited scope of the assessment; the use of outdated test instruments; inconsistent findings, particularly with respect to known patterns of performance in

individuals with MS; failure to document psychological functioning with measures that include adequate validity indices; and evidence that Swanberg had displayed inadequate effort and motivation during her evaluation. (Id.) Dr. Crouch concluded that there was "[n]o valid/reliable evidence . . . that would indicate the claimant is functionally impaired from carrying out her usual activities due to impairments attributable to mental illness." (AR 229.) He opined that a more complete neuropsychological examination or a referral to a neurologist for assessment of her physical symptoms might be helpful in further evaluating her impairments. (Id.)

The neurological review of Swanberg's LTD file was performed by Dr. Klein. (D.C.S.F. ¶ 21; AR 239-247.) Dr. Klein noted that Swanberg was claiming impairment on the basis of fatigue, gait imbalance, and trouble with focus, concentration, and attention. (AR 240, 242.) After reviewing Swanberg's medical file, Dr. Klein concluded that Swanberg's medical history supported a diagnosis of MS, obstructive sleep apnea, cervical spondylosis, and several other conditions. (AR 240.) Dr. Klein observed that each of those conditions was currently stable and asymptomatic as the result of treatment and that Swanberg's MS had been "mostly stable since at least 2012." (Id.) She noted that fatigue was a well-known side effect of one of Swanberg's drugs, Neurontin, and that Dr. Weisman had adjusted Swanberg's prescription to be taken only at night time to alleviate that effect. (Id.) She rendered the following opinion with respect to Swanberg's physical restrictions and limitations:

> Restrictions and limitations on a physical basis supported by the evidence reviewed include avoid standing or walking more than occasional, avoid bending from standing more than occasional, avoid reaching overhead more than occasional, avoid crawling, avoid kneeling, and allow up to a five minute break every hour as needed during prolonged keyboarding. These would most likely be permanent but not preclude full time work capacity at least at the sedentary level.

(AR 240.)

Liberty also referred Swanberg's LTD claim file to a vocational expert, Lori Ashworth ("Ashworth"), for an occupational analysis. (D.C.S.F. ¶ 25; AR 251-254.) Ashworth reviewed Swanberg's entire LTD claim file, the job description of an Asset Manager I, and standard vocational resources including Dictionary of Occupational Titles ("DOT"), Occupational Information Network ("O*Net"), Occupational Outlook Handbook ("OOH"), and Internet job boards. (AR 252.) Ashworth determined that, in the national economy, Swanberg's occupation most closely resembled that of a "Loan Officer" as described in several Department of Labor resources. (AR 252-253.) Ashworth reported that the job of a Loan Officer was most often performed at the sedentary level of physical demand, with only occasional periods of walking or standing and no bending, twisting, kneeling, crouching, or stooping. (AR 253.) She further reported that the mental/cognitive demands of a Loan Officer included active-listening, communication via telephone and in-person, decision-making, critical thinking, concentration, focus, complex problem-solving, organizing, planning, and time management. (AR 254.)

After receiving the independent evaluations from Ashworth and Drs. Crouch and Klein, Liberty sent a copy of Dr. Klein's report to Dr. Weisman for review and comment. (D.C.S.F. ¶ 27.) Dr. Weisman did not respond to Liberty's request. (Id. ¶ 28.)

Liberty also sent a copy of Dr. Crouch's report to Drs. Buzogany and Fields for similar review and comment. (D.C.S.F. ¶ 27.) While Dr. Fields did not respond to Liberty's request, Dr. Buzogany responded by letter dated June 19, 2014. (Id. ¶ 28.) Dr. Buzogany reported that, because he had only seen Swanberg on three occasions, he was "not in a position to make any definitive opinion as to her disability." (AR 303.) He noted that he had diagnosed Swanberg with a Mood Disorder Due to Medical Condition, but indicated that her condition appeared to be effectively treated by prescription drugs. (Id.) Finally, he acknowledged that he was not familiar

with the neuropsychological screening tests performed by Dr. Fields and that he agreed with Dr. Crouch that a more thorough, formal neuropsychological evaluation would be required to determine cognitive function.  (Id.)

On July 1, 2014, Liberty sent a letter to Swanberg informing her that it had conducted a thorough review of her disability claim and determined that she was not eligible for LTD benefits beyond June 30, 2014.  (AR 306-309).  Liberty explained that the medical information provided by Drs. Buzogany, Fields, McQuigg, and Weisman did not support a finding that Swanberg continued to meet the definition of disability set forth in the Plan.  (AR 306.)  Liberty observed that Dr. Fields had questioned whether Swanberg was putting forth optimal effort during her evaluations.  (AR 306.)  Liberty also credited Dr. Crouch and Dr. Klein's conclusions that Swanberg's impairments did not support any restrictions or limitations that would prevent her from performing her job at a full-time level.  (AR 306-307.)  Liberty concluded that Swanberg was able to perform all of the material and substantial duties of her own occupation as normally performed in the national economy, even with the restrictions suggested by Dr. Klein.  (AR 308.)  Liberty advised Swanberg that her LTD benefits would be terminated as of July 1, 2014, and that she had 180 days to appeal that determination.  (AR 308-309.)

On September 16, 2014, Swanberg, through her attorney, appealed Liberty's decision to terminate her LTD benefits.  (D.C.S.F. ¶ 34.)  Swanberg supplemented her appellate file with updated medical records from recent visits to Drs. Weisman and McQuigg.  (Id.)  Dr. Weisman's notes from her visit on June 11, 2014, indicated that her MS was "stable," as evidenced by new MRI brain scans.  (Id.)  He noted that she continued to report "moderate to severe" daytime fatigue and that medication for those symptoms was "sometimes helpful and sometimes not." (AR 337.)  He characterized her fatigue as "gradually increasing" and noted that it was

accompanied by "cognitive impairment in a number of areas." (Id.) He concluded by opining that he believed Swanberg to be "disabled from any gainful employment," but did not impose any specific restrictions or limitations. (Id.)

Swanberg reported to Dr. Weisman's office for a follow-up appointment with Kara Deal ("Deal"), a Physician Assistant, on July 11, 2014. (D.C.S.F. ¶ 34.) Deal noted that Swanberg's MS continued to be "stable without any relapses." (Id.) She also noted that Swanberg continued to feel tired during the day. (AR 330.) Deal ordered bloodwork and noted that she would discuss Swanberg's disability status with Dr. Weisman, but did not impose any restrictions or limitations. (D.C.S.F. ¶ 34.)

On July 14, 2014, Swanberg visited Dr. McQuigg for a regularly scheduled examination. (AR 324.) Dr. McQuigg did not report any significant changes in Swanberg's condition. (Id.)

On September 30, 2014, Liberty referred Swanberg's file to Liberty's Appeal Review Unit for an independent review of her claim eligibility. (AR 343.) On October 29, 2014, Liberty notified Swanberg that it had denied her appeal. (AR 347.) Liberty explained that it had considered her entire case file and medical history, including the updated medical records provided in conjunction with her appeal. (D.C.S.F. ¶¶ 36-37.) Liberty acknowledged that Swanberg was continuing to experience symptoms from her medical conditions, but concluded that "the available information does not contain exam findings, diagnostic test results, or other forms of objective medical evidence substantiating that her symptoms were of such severity, frequency, and duration that they resulted in restrictions and limitations rendering her unable to perform the duties of her occupation beyond June 30, 2014." (AR 351.) Liberty also informed her that, as of that date, "[Swanberg's] administrative right to review has been exhausted and no further review will be conducted by Liberty and her claim will remain closed." (AR 352.)

On November 4, 2014, Liberty received an additional submission from Swanberg's attorney, mailed on October 27, 2014. (Joint Concise Statement of Material Facts in Support of Plaintiff's Motion ("P.C.S.F.") (ECF No. 34) ¶ 16; AR 1.) That submission contained the report of a neuropsychological evaluation performed by Dr. Michael Franzen on September 29, 2014. (P.C.S.F. ¶ 16.) Dr. Franzen performed a battery of tests including: 21-Item Word List; Test of Memory Malingering; Conners' Continuous Performance Test; Kaufman Brief Intelligence Test; Wechsler Memory Scale; Judgment of Line Orientation; Full Range Test of Visual Motor Integration; Grooved Pegboard; Hand Dynamometer; Controlled Oral Word Association; Animal Fluency Test; Wechsler Memory Scale IV; Rey-Osterrieth Complex Figure; Stroop Color Word Test; Trail Making A&B; Wisconsin Card Sorting Test; and Personality Assessment Inventory. (Id. ¶ 16d.) Some of these tests contained embedded measures for the purpose of exploring her motivation and effort. (Franzen Report (ECF No. 24-1) at 3.)

In his report, Dr. Franzen observed that Swanberg's "performance on measures of attention and concentration represented an area of weakness." (Id.) He noted that her performance in attention, processing speed, and memory had declined since her previous evaluation. (Id. at 5.) He also indicated that her performance on tasks related to motivation and effort was inconsistent, "suggesting less than optimal effort on at least some of the tests administered." (Id. at 3.) He explained, however, that "[i]nconsistent effort may be explained by fatigue, apathy, confusion, internal or external distractions, or internal of [sic] external motivations." (Id.) He concluded that Swanberg appeared to meet the criteria for "major depressive disorder" and explained that this condition commonly caused difficulties with "cognitive functions including attention, processing speed, and executive functioning." (Id. at 6.) He recommended that Swanberg continue with her psychiatric treatments in hopes of

improving her cognition. (Id.) Because Liberty had already issued its determination decision, it did not discuss Dr. Franzen's report or include it in the administrative record. (AR 1.)

## III. Procedural History

Swanberg commenced this action on April 27, 2015. (ECF No. 1.) She filed an amended complaint on May 4, 2015. (ECF No. 3.)

On February 29, 2016, the parties filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (ECF Nos. 22, 25.) Both parties filed responsive briefs on March 30, 2016 (ECF Nos. 28, 30), and the Plan filed a reply brief on April 13, 2016. (ECF No. 33.) The parties' motions are now fully briefed and ripe for review.

## IV. Standard of Review

In Firestone Tire & Rubber Co. v. Bruch, the United States Supreme Court instructed courts to apply a deferential standard of judicial review to claims grounded in 29 U.S.C. § 1132(a)(1)(B) where the ERISA plan at issue grants discretionary authority to a plan administrator to evaluate and decide claims for benefits. Firestone, 489 U.S. 101, 115 (1989) (holding that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."). The parties agree that the Plan (by virtue of the ASOA) vested Liberty with sole discretionary authority to construe and interpret the terms of the Plan and to evaluate and decide all questions of eligibility and entitlement to benefits. (D.C.S.F. ¶ 4.) As such, Liberty's denial of LTD benefits will be reviewed under an "arbitrary and capricious" standard. Firestone, 489 U.S. at 103.

The scope of review under the arbitrary and capricious standard "is narrow." Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3d Cir. 1997). The court may overturn a decision of the

Plan administrator only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993); Marshall v. AT & T Umbrella Benefit Plan No. 1, 804 F.Supp.2d 408, 415 (W.D. Pa. 2011) (noting that, under the arbitrary and capricious standard, "the Court must accord extreme deference to the Defendant plan's determination"). As long as the administrator's decision was reasonable and supported by evidence, the court must uphold the administrator's decision. Firestone, 489 U.S. at 111; see Orvoch v. Program of Group Ins. For Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000) (observing that a court applying an arbitrary and capricious standard of review "is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.").

In conducting its review, the court is limited to the record before the administrator at the time of the decision. Mitchell, 113 F.3d at 440 ("Under the arbitrary and capricious standard of review, the 'whole' record consists of that evidence that was before the administrator when he made the decision being reviewed."). The burden is on the plaintiff to prove that the decision of the administrator was arbitrary and capricious. Marshall, 804 F.Supp.2d at 415 (citing Mitchell, 113 F.3d at 439-40).

IV. **Discussion**

A. **Plaintiff's Motion for Summary Judgment**

Swanberg contends that the Plan's decision to deny her continuing LTD benefits was arbitrary and capricious because the Plan: 1) reversed its prior decision granting Swanberg benefits without any new medical evidence to support the decision to terminate benefits; 2) failed to account for all of Swanberg's symptoms in determining whether she was disabled; and 3)

failed to evaluate and consider the neuropsychological report provided by Dr. Franzen. Each of Swanberg's arguments will be addressed in turn.

### 1.  Reversal of Prior Decision Awarding LTD Benefits

Swanberg contends that the Plan acted arbitrarily and capriciously when it terminated her LTD benefits on June 30, 2014, after previously awarding benefits. Swanberg cites the Third Circuit Court of Appeals' decision in <u>Miller v. American Airlines</u> for the proposition that an administrator's reversal of its decision to award a claimant LTD benefits "without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion." <u>Miller</u>, 632 F.3d at 848.

In <u>Miller</u>, the plan administrator abruptly terminated the plaintiff's LTD benefits after receiving updated medical reports from the plaintiff's physician suggesting that his mental health conditions were asymptomatic. <u>Id</u>. at 848-49. The court, however, noted that the more recent reports did not "differ in any material aspect from the records submitted [previously] that [the administrator] determined supported a disability finding." <u>Id</u>. at 848. In other words, "the more recent reports were only 'new' to the extent that they had not been received before; they did not provide any new information." <u>Id</u>. at 849. The court of appeals held that reliance on that evidence to support a change in position was arbitrary and capricious. It commented:

> [T]he information that American relied upon to terminate Miller's benefits in 2006 was the same type of documentation that American interpreted to support a disability finding in 1999 and again in 2003 through 2006. We recognize that American's initial payment of Miller's benefits does not operate as an estoppel such that they can never terminate benefits. But, in the absence of any meaningful evidence to support a change in position, American's abrupt reversal is cause for concern that weighs in favor of finding that its termination decision was arbitrary and capricious.

<u>Id</u>.

Unlike in <u>Miller</u>, there was ample "new medical evidence" in the instant case to support the Plan's termination of Swanberg's benefits. Indeed, when Liberty initially approved Swanberg's request for LTD benefits in December of 2013, Liberty had yet to even receive Swanberg's LTD application, supporting medical information, or neuropsychological evaluations. (AR 35.) Liberty explicitly cautioned Swanberg at that time that her claim would be "evaluated periodically to determine ongoing eligibility" and that "approval at this time does not guarantee payments through the maximum benefit duration." (<u>Id</u>.) Liberty requested that she complete a formal application for LTD benefits within a month in order to support her claimed disability. (<u>Id</u>.)

Liberty received her application, accompanied by her medical records from Dr. Weisman, one month later. (AR 82-121.) Dr. Weisman's notes expressed that he believed Swanberg to be disabled, but also indicated that her MS was being effectively controlled by medication. (AR 84, 86, 88, 93.) Over the next few months, Liberty received updated information from Dr. Weisman, Dr. Buzogany, Dr. McQuigg, and Dr. Fields. (AR 152-160, 164-168, 171-175, 198-223.) Aside from Dr. Weisman, none of Swanberg's physicians opined that she was disabled or imposed any restrictions or limitations on her ability to work. (AR 162, 170, 217-219.)

Liberty then sought and received independent neuropsychological and neurological reviews from Dr. Crouch and Dr. Klein. (D.C.S.F. §§ 19-21.) Dr. Crouch concluded that there was no valid or reliable evidence to support any impairment that could be attributed to mental illness. (AR 229.) Dr. Klein observed that Swanberg's physical ailments supported a number of physical restrictions and limitations, but determined that none of those limitations would prevent her from performing sedentary work. (AR 240.) Dr. Crouch and Dr. Klein each ultimately concluded that Swanberg was not disabled. (AR 229, 240.)

The aforementioned records unequivocally represented new medical information and evidence that was not available to the Plan at the time that it made its initial benefits determination.[1] Under these circumstances, the Plan's decision to terminate her benefits was not arbitrary and capricious. Compare Haisley v. Sedgwick Claims Mgmt. Serv., Inc., 776 F.Supp.2d 33, 49 (W.D. Pa. 2011) (holding that a plan administrator's reliance on the same report that had supported an initial award of benefits to later terminate those benefits counseled towards finding an abuse of discretion), with Balas v. PNC Fin. Serv. Grp., Inc., No. 10-249, 2012 WL 681711, at *14 (W.D. Pa. Feb. 29, 2012) (finding no abuse of discretion where the administrator relied on new and updated medical information and records to terminate LTD benefits after advising the plaintiff of her continuing obligation to provide proof of her disability).

### 2. Failure to Consider Swanberg's Symptoms of Fatigue

Swanberg next contends that the Plan lacked substantial evidence to support its determination that her cognitive difficulties did not restrict her from performing the duties of her occupation. In particular, Swanberg suggests that the Plan "summarily glossed over" her well-supported symptoms of fatigue in rendering its decision. (Plaintiff's Memorandum in Support of Summary Judgment ("Pl. Memo.") (ECF No. 23) at 8.) To prevail, Swanberg must establish that the Plan's determination was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Abnathya, 2 F.3d at 45.

In order to receive LTD benefits under the Plan, Swanberg had the burden of establishing that she was "unable to perform the material or essential duties of [her] own occupation as it is

---

[1] Swanberg does not appear to indicate which records she believes that the Plan initially relied upon in granting her request for LTD benefits. In a case such as this one, where the Plan awarded benefits on a preliminary basis while awaiting further documentation of the impairments that might support that award, a large portion of the medical record necessarily consists of "new medical evidence."

normally performed in the national economy."  (D.C.S.F. ¶ 5.)  This standard required Swanberg

to go beyond merely establishing that she suffered from a particular symptom, complaint, or

condition; she also had to show that the purported symptom, complaint or condition resulted in

functional limitations that rendered her "disabled" within the meaning of the Plan.  As explained

by one court:

> That a person has a true medical diagnosis does not by itself establish
> disability. Medical treatises list medical conditions from amblyopia to
> zoolognia that do not necessarily prevent people from working. After a
> certain age, most people have pain, with or without palpation, in various
> parts of their body, and they often have other medical conditions.
> Sometimes their medical conditions are so severe that they cannot work;
> sometimes people are able to work despite their conditions; and
> sometimes people work to distract themselves from their conditions.

Jordan v. Northrop Grumman Corp. Welfare Ben. Plan, 370 F.3d 869, 880 (9ᵗʰ Cir. 2004); see

Balas, 2012 WL 681711, at *12 (upholding denial of LTD benefits where both treating

physicians opined that the plaintiff was disabled due to fatigue, but where neither doctor listed

any restrictions or limitations on performing the essential functions of her occupation); Boby v.

PNC Bank Corp., No. 11-848, 2012 WL 3886916, at * (W.D. Pa. Sep. 6, 2012) (noting that

plaintiff was required to provide evidence of "the limitations resulting from his diagnoses which

precluded him from performing his job").

After reviewing her medical submissions, the Plan acknowledged that Swanberg had

provided sufficient evidence to support diagnoses of MS, cervical spondylosis, and obstructive

sleep apnea.  (AR 307.)  The record also supported Swanberg's complaints of experiencing

fatigue as a result of her impairments.  (P.C.S.F. ¶ 18.)  As noted by the Plan, the record,

however, lacked any "valid or reliable evidence that neurocognitive or psychiatric symptoms [of

her diagnoses] *are causing functional impairment*."   (Id.) (emphasis added).   None of

Swanberg's treating physicians opined that she was subject to any limitation or restriction that

would prevent her from performing her job.  Dr. Fields observed that Swanberg displayed average to impaired responses to tests of attention, language, speed of processing, and memory, but opined that her responses in some areas were "suggestive of less than optimal effort," perhaps in an attempt to "fake bad."  (AR 152, 154.)  Dr. Buzogany consistently characterized her orientation, memory, attention, and language as "normal," her judgment and insight as "intact," and her thought-processes and thought-associations as "normal" and without deficiency. (AR 207.)  Dr. McQuigg described her MS symptoms as "asymptomatic" and noted that she was "doing well" with management of her MS.  (AR 171.)  Only Dr. Weisman opined that Swanberg was disabled, but he did so without explaining his conclusion or suggesting any restrictions or limitations that might assist the Plan in determining whether she could perform the essential functions of her occupation.  (AR 165.)  The Plan reasonably concluded from this evidence that Swanberg's fatigue symptoms, even if serious, did not restrict her from working.

The Plan's determination finds further support in the medical opinions provided by two independent experts.  After reviewing her entire file, Dr. Crouch concluded that there was "[n]o valid/reliable evidence . . . that would indicate the claimant is functionally impaired from carrying out her usual activities due to impairments attributable to mental illness."  (AR 229.) Dr. Klein observed that Swanberg was suffering from fatigue, gait imbalance, and trouble with focus and concentration, but concluded that the only restrictions and limitations supported by those impairments were the type of physical restrictions that would not prevent Swanberg from performing sedentary work.  (AR 240, 242.)  The Plan's reliance on these expert opinions was reasonable and sound.[2]

---

[2] Notably, a plan administrator "is not required to give greater weight to the opinions of a claimant's treating physicians than to those of independent medical examiners."  Balas, 2012 WL 681711, at *12 (citing Black & Decker Disability Plan v. Nord, 538 U.S. 822, 829-30 (2003)).

In short, the court finds that substantial evidence supported the Plan's determination that Swanberg was not disabled. While Swanberg might prefer that the Plan had weighed the evidence differently, the court "is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." Orvoch, 222 F.3d at 129. Because the Plan's decision was not "without reason, unsupported by substantial evidence or erroneous as a matter of law," it must be upheld. Abnathya, 2 F.3d at 45.

### 3. Failure to Consider the Report Issued by Dr. Franzen

Finally, Swanberg contends that the Plan failed to consider the neuropsychological report issued by Dr. Franzen which, according to Swanberg, would have compelled a reversal of her unfavorable benefits determination on appeal. It is clear, however, that Liberty did not receive Dr. Franzen's report until November 4, 2014, almost one week after Liberty had already issued its decision to uphold the denial of Swanberg's LTD benefits. (AR 1, 347.) Liberty had already notified Swanberg that her "administrative right to review [had] been exhausted and no further review will be conducted by Liberty and her claim will remain closed." (AR 352.) Contrary to Swanberg's allegations, Liberty did not turn a "blind eye" to Dr. Franzen's report; it simply arrived too late for Liberty to consider it in making its final determination. (Pl. Memo. (ECF No. 23) at 10.) Swanberg's contention that the Plan acted arbitrarily and capriciously by ignoring the report is without merit.

Nor can the report be considered by this court. It is well settled that, when courts apply an "arbitrary and capricious" standard of review, discovery is generally limited to the administrative record. Post v. Hartford Ins. Co., 501 F.3d 154, 168 (3d Cir. 2007). The "administrative record" consists of the "evidence that was before the plan administrator when it made the decision being reviewed." Mitchell v. Deloitte & Touche Grp. Ins. Plan, 619 F.3d

1151, 1157 (3d Cir. 1997). A limited exception exists for the consideration of evidence of "potential biases and conflicts," such as evidence of a plan's funding mechanism, which might assist the court in determining what standard of review applies to the plaintiff's claims. Post, 501 F.3d at 168. Extrinsic medical evidence, however, cannot be considered for the purpose of determining whether the plan administrator reached the correct decision. Id. at 168-69 ("Because all of [the extrinsic] documents are medical reports, they are not relevant to the issue of bias; rather, they are only relevant to whether Hartford reached the right decision. [Thus], they cannot be considered for that purpose because they were not submitted to [the plan administrator] and made part of the record.") (citing Mitchell, 113 F.3d at 440). Simply put, Dr. Franzen's report falls outside the scope of this court's review. Post, 501 F.3d at 169 (noting that the district court properly refused to consider medical reports that were not submitted to the administrator and made part of the record).

### B. Defendant's Motion for Summary Judgment

In its cross-motion for summary judgment, the Plan asserts that the denial of Swanberg's claim was reasonable and supported by substantial evidence. As discussed above, the record reflects that the Plan properly considered and evaluated all medical evidence of record, including the expert opinions of an independent neurologist and neuropsychologist, and reasonably determined that Swanberg's symptoms did not produce any limitations and restrictions that would prevent her from performing her sedentary position as an Account Manager I. For the same reasons that support the denial of Swanberg's motion for summary judgment, the Plan's motion for summary judgment will be granted.

**V. Conclusion**

For the foregoing reasons, the Plan's motion for summary judgment will be granted. Swanberg's motion for summary judgment will be denied. An appropriate order follows.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge

Dated: August 26, 2016